STARTER CORPORATION, Plaintiff–Counter–Defendant–Appellant,

v.

CONVERSE, INC., Defendant–Counter–Claimant–Appellee.

No. 97–9030.

United States Court of Appeals, Second Circuit.

Argued March 31, 1998.

Decided March 12, 1999.

Margaret M. Zwisler, (Richard A. Ripley, Elizabeth B. McCallum, Diane E. Wolf, Howrey & Simon, Washington, D.C., of counsel), for Plaintiff–Counter–Defendant–Appellant.

Harley I. Lewin, (G. Roxanne Elings, Lewin & Laytin, P.C., New York, NY, of counsel), for Defendant–Counter–Claimant–Appellee.

BEFORE: PARKER, Circuit Judge, EGINTON,* and GLASSER,** District Judges.***

PARKER, Circuit Judge:

Starter Corporation ("Starter") appeals from a final judgment of the United States District Court for the Southern District of New York (Charles S. Haight, *Senior Judge* ) entered July 29, 1997 issuing a declaratory judgment and awarding a permanent injunction following a jury verdict in favor of Con-

---

* The Honorable Warren W. Eginton of the United States District Court for the District of Connecticut, sitting by designation.

** The Honorable I. Leo Glasser of the United States District Court for the Eastern District of New York, sitting by designation.

*** This matter has been heard by a panel of one circuit judge and two district judges by order of the Chief Judge of the United States Court of Appeals for the Second Circuit certifying a judicial emergency, pursuant to 28 U.S.C. § 46(b).

verse, Inc. ("Converse") on the issues of trademark infringement, breach of contract, and equitable estoppel.

## I. BACKGROUND

Since 1917, Converse has produced primarily athletic footwear bearing various trademarks which contain a five-pointed star ("Converse Star Marks") registered with the United States Patent and Trademark Office (the "PTO"). Since 1971, Starter has designed and sold athletic apparel and owns three principal trademarks: (1) the name "Starter;" (2) the "S–and–Star Mark;" and (3) the composite mark (combining marks (1) and (2)) (the latter two marks shall be referred to jointly as the "Starter Star Marks"). Starter does not manufacture or sell shoes bearing the Starter Star Marks, except for a currently marketed "Rugged Terrain" shoe, where the marks are incorporated into another logo, and a 1987–88 children's shoe with a Mets logo on one side and one of the disputed marks on its heel.

In early 1988, Starter filed an application with the PTO to register the Starter Star Marks for use on apparel and shoes (the "1988 Application"). Converse opposed the application. Extensive negotiations began between Starter and Converse through their attorneys, resulting in a written agreement in January 1990 (the "1990 Agreement"). Under the 1990 Agreement, Starter agreed to amend the 1988 Application "to delete the goods 'shoes and sneakers,' without prejudice." In addition, Converse: (i) agreed to withdraw its opposition to the 1988 Application and Starter's Canadian application; (ii) consented to Starter's registration of the plain "Starter" mark for apparel *including* footwear; and (iii) consented to Starter's registration of the S–and–Star mark for apparel *excluding* footwear. In a cover letter enclosing the draft written agreement, Starter stated that the 1990 Agreement would settle the "present dispute" and that Starter was "not using a star logo on shoes or sneakers, and

has no plans for doing so. Consequently, we feel that the language of this agreement takes care of any real disputes between the parties."

In 1995, there was a major change in the apparel industry called "head-to-toe" marketing whereby universities and athletic teams began to purchase all of their athletic apparel, from headgear to shoes, from one provider. A former CEO from Converse agreed that "head-to-toe" marketing created a "legitimate business concern" among those selling sports apparel to those entities. In 1993, in order to enter the "head-to-toe" market, Starter again filed an application to register Starter Star Marks for use on shoes (the "1993 Application"). Again, Converse opposed. Converse advised Starter that if it sold shoes bearing the Starter Star Marks, Converse would sue for trademark infringement.

*The Proceedings Below*

On May 19, 1995, Starter filed this case pursuant to 28 U.S.C. §§ 2201–2202, alleging that it was prepared immediately to bring footwear bearing the Starter Star Marks to market and seeking a declaratory judgment that using its Starter Star Marks on shoes would not infringe upon the Converse Star Marks pursuant to 15 U.S.C. § 1115 *et seq.*[1] Converse answered the Complaint alleging that Starter was barred from using the Starter Star Marks on shoes based on either (i) contractual estoppel, arising from the 1990 Agreement, or (ii) equitable estoppel, arising from Starter's false representation to Converse that it would not use the Starter Star Marks on footwear and Converse's reasonable and foreseeable reliance on this representation to its detriment.

Converse also brought six counterclaims for federal and common law infringement, dilution and unfair competition, and asked the district court for injunctive relief forbidding Starter from using its marks on footwear and from registering its marks for use

---

1. On November 13, 1995, the district court, on Converse's motion, dismissed Starter's claim, reasoning that there was no case or controversy. *Starter Corp. v. Converse, Inc.*, No. 95 Civ. 3678, 1995 WL 679190 (S.D.N.Y. Nov.15, 1995). This Court reversed, holding that declaratory judg-

ment was proper where Starter had "engaged in a course of conduct evidencing a 'definite intent and apparent ability to commence use' of the marks on the product." *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595–96 (2d Cir.1996) (citation omitted).

on footwear. Starter moved to dismiss Converse's counterclaims and Converse stipulated to such a dismissal. Shortly before trial, however, Converse moved to reassert its counterclaims. The district court denied the motion on the ground of prejudice to Starter on the eve of trial. *See Starter Corp. v. Converse, Inc.*, No. 95 Civ. 3678, 1996 WL 684165 (S.D.N.Y. Nov. 26, 1996).

Both parties moved for summary judgment on Converse's estoppel defenses. The district court denied both parties' summary judgment motions finding that the 1990 Agreement was not completely integrated and also "ambiguous," making the terms of the agreement and extrinsic evidence thereto a question of material fact for the jury. *See Starter Corp. v. Converse, Inc.*, No. 95 Civ. 3678, 1996 WL 706837, (S.D.N.Y. Dec. 3, 1996).

Before trial, Converse requested that the parties be realigned. In a memorandum opinion and order, the district court held that it would "re-align Converse as plaintiff if, and only if, it is prepared to concede that Starter satisfies the second [and the only disputed] ... prong" of this Court's test for declaratory judgment jurisdiction in a trademark case, namely, that Starter has an " 'actual intent and ability to imminently engage in the allegedly infringing conduct.' " *Starter Corp. v. Converse, Inc.*, No. 95 Civ. 3678, 1996 WL 694437, at *2–*3 (S.D.N.Y. Dec. 3, 1996) (quoting *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595–96 (2d Cir.1996)). At a pretrial hearing, Converse made this concession. As a result, the district court realigned the parties for trial,[2] allowing Converse to open and close to the jury, because Converse now had "the burden of proof on the only remaining substantive issue," namely, whether use of the Starter marks on shoes would infringe upon the Converse mark. *Starter Corp. v. Converse, Inc.*, No. 95 Civ. 3678, 1996 WL 694437, at *3 (S.D.N.Y. Dec. 3, 1996).

Trial began on December 9, 1996 and lasted nine days. Prior to opening statements, Starter sought a ruling to preclude Converse from referring to letters exchanged between the parties in connection to the 1990 Agreement. Starter argued that the letters were inadmissible as evidence at trial because they constituted settlement negotiations, barred pursuant to Fed.R.Evid. 408. The district court explained that although the letters could be regarded in part as statements made in compromise negotiations, they were also held up by Converse as evidence of its estoppel claims. However, regarding the letters written by Converse's counsel, the district court ruled that even if they did not fall within the ambit of Rule 408, they were inadmissible as hearsay. On the other hand, the letters from Starter's counsel to Converse were admissible as non-hearsay party admissions. In his opening remarks to the jury, Converse's attorney mentioned Starter's letters which lead to the 1990 Agreement. As a result, Starter moved for a mistrial, which was denied without explanation. *Id.*

Much of Converse's proof at trial focused on the settlement negotiations and the 1990 Agreement. Seven of the fifteen trial witnesses spoke to the terms of the settlement. Over Starter's various objections, Converse was permitted to introduce the 1990 Agreement as well as extrinsic correspondence before and after the date of that agreement.

The jury returned affirmative answers to all four special verdict questions, finding: (1) that Starter's use of its S–and–Star Mark on athletic footwear would cause a likelihood of consumer confusion; (2) that Starter's use of the Composite Mark on athletic footwear would cause a likelihood of consumer confusion; (3) that there was a binding contract between Starter and Converse that Starter would not use its marks on athletic shoes; and (4) that Starter was estopped because Starter made oral representations that it would not use its star marks on athletic shoes. *See Starter Corp. v. Converse, Inc.*, No. 95 Civ. 3678, 1997 WL 391266, at *1, *9 App. A (July 11, 1997) (Special Verdict Form). After trial, Starter moved for judgment as a matter of law, pursuant to Fed. R.Civ.P. 50(b), both as to the likelihood of

---

**2.** Due to the realignment of the parties, Converse's affirmative defenses of contractual and equitable estoppel became claims against Starter and will be referred to as claims throughout this opinion.

confusion and as to Converse's estoppel claims. In the alternative, Starter moved for a new trial, pursuant to Fed.R.Civ.P. 59. Subsequently, the district court denied all post-trial motions. *Id.* at * 9.

In its judgment entered December 31, 1996, the district court indicated that it planned *sua sponte* to enter an injunction against Starter based on the jury's verdict. In a letter to the court, Starter objected to the imposition of an injunction based on the fact that Converse had stipulated to withdraw its counterclaims which supported this relief and had not sought this relief. In an order dated January 8, 1997 and a memorandum opinion and order dated July 11, 1997, the district court confirmed its intention to enter an injunction against Starter depending on the outcome of the post-trial motions. At no time did Starter request a hearing on the matter. On July 24, 1997, the court entered an injunction against Starter, the terms of which will be discussed in greater detail below.

## II. DISCUSSION

On appeal, Starter contends that the district court abused its discretion in rendering certain allegedly erroneous evidentiary rulings that so prejudiced Starter that a new trial is necessary. Starter also argues that the district court abused its discretion in entering injunctive relief against Starter because the injunction (1) was imposed *sua sponte* in a manner unauthorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and (2) was beyond the scope of the jury verdict.

We find that none of the district court's evidentiary rulings constituted a reversible abuse of its discretion warranting a new trial. We also find that the district court was well within its discretion to grant *sua sponte* permanent injunctive relief, pursuant to the Declaratory Judgement Act. However, we agree with Starter that the district court abused its discretion in entering an injunction beyond the scope of the jury verdict and remand to the district court for a more limited formulation of injunctive relief in favor of Converse based on this opinion.

### A. *Evidentiary Rulings of the District Court*

Starter contends that the district court abused its discretion in rendering the following evidentiary rulings: (a) admitting evidence of the 1990 Agreement, in violation of Rule 408; (b) permitting the introduction of parol evidence on the surrounding circumstances of the 1990 Agreement based on its finding that the agreement contained an ambiguity and was not fully integrated; (c) excluding Starter's survey evidence which would have provided proof on the issue of actual confusion; and (d) admitting into evidence a shoe prototype designed and made by Converse allegedly bearing one of Starter's Star Marks. We review the district court's evidentiary rulings under an abuse of discretion standard, requiring "manifest error" to disturb them. *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 514 (2d Cir.1989).

### 1. *The Admission of the 1990 Agreement and Related Documents*

Starter argues that the district court abused its discretion in admitting evidence of the 1990 Agreement and its surrounding circumstances. First, Starter contends that because likelihood of confusion was the sole issue to be determined at trial, the settlement evidence was irrelevant. Second, Starter argues that the district court admitted settlement evidence in violation of Fed. R. Evid. 408, even if the settlement agreement was offered to prove an agreement between the parties. Third, in the alternative, Starter argues that, even if the settlement evidence was properly admitted under Rule 408, it caused spillover prejudice to Starter by making it appear to the jury that Starter had settled the issue of likelihood of confusion on which Converse's challenge to the 1990 Application was based.

We find that the district court did not abuse its discretion in admitting the settlement evidence for the limited purpose of proving Converse's estoppel claims which were both relevant to the issues at trial and not unfairly prejudicial to Starter on the issue of likelihood of confusion.

### a. *Relevance of the Settlement Evidence*

■ Starter argues that the settlement evidence was not relevant because the sole issue at trial was trademark infringement. In a pretrial conference immediately preceding the trial, during which Starter moved to exclude such evidence, the district court ruled that the settlement evidence was relevant to the estoppel claims. However, Starter contends that, procedurally, Converse should not have been permitted to assert its estoppel claims—the basis for admitting the 1990 Agreement—in light of Converse's own factual concession before trial that Starter had the "ability" to bring shoes with the disputed marks to market. Starter argues that estoppel related solely to Starter's claims that it had such an ability.

Starter is simply incorrect on this point. While it is true that before trial Converse conceded Starter's *ability* to sell shoes with the disputed marks, Converse never conceded Starter's *right* to do so. Thus, when the district court realigned the parties, Converse assumed the burden of proof to show that Starter was barred by estoppel, i.e. had no *right* to bring similar products to market bearing the disputed marks based upon: (1) a likelihood of confusion between the registered Converse trademarks and the unregistered Starter Star Marks and (2) contractual and equitable estoppel of Starter as to its use of the Starter Star Marks.

Thus, the adjudication of Converse's realigned estoppel claims were applicable and relevant to Starter's realigned defense at trial—that Starter was entitled to a declaration that it had a right to proceed and would not infringe Converse's marks by bringing to market shoes bearing the Starter Star Marks. Accordingly, the district court did not abuse its discretion by permitting Converse to proffer evidence, including the 1990 Agreement, to prove its estoppel claims.

### b. *Settlement Evidence under Rule 408*

■ Starter contends that the district court improperly admitted settlement evidence as a tacit admission of infringement in violation of Fed.R.Evid. 408. Converse counters that it offered the settlement evidence to prove that Starter was estopped, either contractually or equitably, from using the disputed marks on athletic shoes, not to show that Starter was liable on the issue of likelihood of confusion.

■ Rule 408 provides in relevant part:

Evidence of (1) furnishing ... or (2) accepting ... a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is *offered for another purpose* ...

Fed R. Evid. 408 (emphasis added). Rule 408 bars the use of settlement evidence to establish the validity or invalidity of a claim of trademark infringement. *See Playboy Enterprises v. Chuckleberry Publ'g, Inc.*, 687 F.2d 563, 568–69 (2d Cir.1982).

However, evidence of a settlement agreement and its surrounding circumstances "though otherwise barred by Rule 408, can fall outside the Rule if it is offered for 'another purpose,' i.e., for a purpose other than to prove or disprove the validity of the claims that [the agreement was] meant to settle." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir.1989)(quoting Fed.R.Evid. 408); *see* J. Weinstein & M. Berger, Weinstein's Federal Evidence § 408.03[5], at 408–27 (J. McLaughlin ed.1997)(hereinafter "*Weinstein's Evidence*").

■ The trial judge "has broad discretion as to whether to admit evidence of settlement ... offered for 'another purpose.'" *Trebor Sportswear*, 865 F.2d at 511. In applying the "another purpose" exception to Rule 408, "the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Trebor Sportswear*, 865 F.2d at 510–11 (quoting *Weinstein's Evidence*, ¶ 408[05], at 408–31).

In the instant case, Converse sought to introduce evidence of the settlement agreement and settlement negotiations, demonstrated by letters and testimony, to prove its claims of contractual and equitable estoppel. The basic elements of estoppel are: (1) material misrepresentation; (2) reliance; and (3) damage. *See General Elec. Capital Corp. v. Armadora, S.A.,* 37 F.3d 41, 45 (2d Cir. 1994). None of the elements of estoppel overlap with factors used to determine likelihood of confusion between trademarks. *See Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961). Converse's estoppel claims are thus based on representations by Starter that it would not use its mark on shoes without addressing the validity of Converse's claim of likelihood of confusion.

We are satisfied that Converse's need for the settlement evidence to prove its estoppel claims outweighed any potential for discouraging future negotiations between these or other parties which might frustrate the policies underlying Rule 408. *See Trebor Sportswear,* 865 F.2d at 510–11. The parties' prior negotiations resulted in an agreement which was subsequently repudiated by Starter, giving rise to the instant case. Thus, if anything, permitting Starter to exclude the settlement evidence on Rule 408 grounds would flout the policy of promoting compromises under the Rule. Therefore, we find that the district court did not abuse its discretion in admitting the settlement evidence under the "another purpose" exception to Rule 408.

### c. *Spillover Prejudice from the Settlement Evidence*

Even if the settlement evidence was properly admitted under Rule 408, Starter argues that there was spillover prejudice on the issue of likelihood of confusion. Essentially, Starter contends that the district court erred by admitting the settlement evidence without performing the weighing required under Fed.R.Evid. 403. As a result, Starter would have us declare a mistrial because the jury was improperly influenced by the admission of the settlement evidence.

Pursuant to Rule 403, otherwise admissible evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice to the party against whom the evidence is offered. *See* Fed.R.Evid. 403. The probative value of the settlement evidence was extremely high, being virtually essential evidence to prove Converse's estoppel claims. Any unfair prejudice to Starter would only arise if the jury took the settlement evidence as Starter's concession of liability as to likelihood of confusion.

In the first place the evidence only addressed Starter's decision not to use its mark on shoes— it did not mention likelihood of confusion. Furthermore, any potential unfair prejudice was cured when the district court instructed the jury to consider the infringement and estoppel claims separately and required the jury to render separate special verdicts on each of the claims. Thus, we find that the probative value of the settlement evidence far outweighed any danger of unfair prejudice to Starter. Accordingly, no new trial is warranted based on the district court's admission of the settlement evidence.

### 2. *The Admission of Parol Evidence of the 1990 Agreement*

Starter next argues that the district court erred in making the following findings: (1) the use of the term "without prejudice" in the 1990 Agreement was ambiguous and (2) the 1990 Agreement was not a full integration of the mutual promises of the parties. As a result, Starter contends that the district court compounded its error—abusing its discretion—by admitting parol evidence at trial to explain both the contractual ambiguity and the extent of the mutual promises between the parties.

### a. *Integration of the 1990 Agreement*

Starter contends that the 1990 Agreement, though it lacks an express integration clause, should have been presumed to be fully integrated because it was created through ongoing participation of both parties and their counsel. We find no precedent supporting, and see no merit in adopting, such a rule of contract interpretation.

A written contract is considered integrated when the parties intend it to constitute the complete and final expression of their agreement. E. Allan Farnsworth, Contracts § 7.3 (2d ed.1990). When a contract lacks an express integration clause the district court must "determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances." See, e.g., Bourne v. Walt Disney Co., 68 F.3d 621, 627 (2d Cir.1995). We examine the "surrounding circumstances" to see if the parties would ordinarily be expected to embody the agreement in a writing based "upon the type of transaction involved, the scope of the written contract and the content of any other agreements." Id. at 627. When an agreement is not integrated, the parol evidence rule does not apply and extrinsic evidence of a separate oral agreement can be considered. Id. at 626–27.

In ruling on the parties' motions for summary judgment, the district court found that the 1990 Agreement lacked an integration clause. Starter, 1996 WL 706837, *5. Examining the "surrounding circumstances," the district court further found that Converse had a long-standing policy of opposing the use of any type of star trademark on athletic shoes by other companies. However, the 1990 Agreement only dealt with registration of the Starter Star Marks, not the use of the disputed marks. Starter, 1996 WL 706837, *5. Accordingly, the district court concluded that the intentions of the parties did not support a finding that the 1990 Agreement was integrated and thus permitted extrinsic evidence to prove the nature of their mutual promises.

This Court has looked to evidence of the parties' negotiations and the presence of counsel as one of many nondispositive factors used in determining the intent to make the contract fully integrated. See Bourne, 68 F.3d at 628; see also Braten v. Bankers Trust Co., 60 N.Y.2d 155, 468 N.Y.S.2d 861, 456 N.E.2d 802, 804–05 (N.Y.1983). We disagree with Starter that this factor should be the centerpiece of the "surrounding circumstances" test. It is the rare contract that is not the product of the parties' and their respective counsels' negotiations. We decline to adopt such a rule.

The district court did not err when it weighed the surrounding circumstances, finding that the 1990 Agreement lacked integration. Accordingly, the district court neither violated the parol evidence rule nor abused its discretion in admitting extrinsic evidence at trial to show the intent of the mutual promises made by these parties vis a vis the 1990 Agreement.

b. *Ambiguity in the 1990 Agreement*

Next, Starter asserts that "without prejudice" has a definite and special usage in the settlement of trademark registration disputes, and therefore, the district court erred in finding that the 1990 Agreement was ambiguous.

"Contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself...." Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir.1989) (quotation marks and citations omitted). However, where the language in an agreement "is susceptible to differing interpretations, each of which may be said to be as reasonable as another, then ... extrinsic evidence of the parties' intent is properly admissible." Bourne, 68 F.3d at 628 (quotation marks and citations omitted). Ambiguity of a contract term or phrase is to be "considered from the viewpoint of one cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Kerin v. United States Postal Serv., 116 F.3d 988, 992 n. 2 (2d Cir.1997) (quotation marks and citation omitted).

The 1990 Agreement provides that Starter "agrees to amend the Starter U.S. [PTO] application to delete the goods 'shoes and sneakers', without prejudice." Starter claims that the use of "without prejudice" in the 1990 Agreement unambiguously preserved its right to refile an application to register its Starter Star Marks for use on shoes in the future. Converse asserts that the phrase "without prejudice" refers to Starter's right

to have the remainder of its registration application considered by the PTO.

In support of its interpretation of "without prejudice," Starter directs our attention to Section 2.68 of the PTO Rules of Practice; *Warner–Jenkinson Co. v. Allied Chem. Corp.*, 567 F.2d 184, 188 (2d Cir.1977)(stipulation of settlement dismissing "without prejudice" a patent validity claim and a responsive patent infringement defense will not estop one of the parties from subsequently seeking declaratory relief on the issue of patent validity); and *Wells Cargo, Inc. v. Wells Cargo, Inc.*, 606 F.2d 961, 965 (Customs & Patent App.1979) (party's withdrawal of its PTO registration application *with prejudice* constituted an abandonment of any right to register trademarks under the Lanham Act).

Starter argues that § 2.68, *Warner–Jenkinson*, and *Wells Cargo* support its interpretation of "without prejudice" in the 1990 Agreement. Converse counters that both the phrase "with prejudice" used in *Wells Cargo* and the phrase "without prejudice" used in *Warner–Jenkinson* were expressly tied in the language of the respective agreements to the right to refile the PTO applications.

As a general matter, both *Wells Cargo* and *Warner–Jenkinson* as well as § 2.68, support Starter's interpretation that a party's voluntary abandonment of a PTO registration application by means of a written settlement "without prejudice" may allow that party to seek re-application or declaratory relief concerning a trademark infringement. However, that general principle does not help to clarify the use of the phrase "without prejudice" in the context of the 1990 Agreement. Here, "without prejudice," as it was used in the 1990 Agreement was ambiguous because it did not clearly provide that Starter's full registration application could be refiled.

We agree with the district court that, unlike the use of "without prejudice" in *Warner–Jenkinson*, the phrase "without prejudice" in the 1990 Agreement appears "to be tacked on to the end of the relevant clause, almost as an afterthought" and did not clearly refer to the intentions of the parties. *Starter*, 1996 WL 706837, at *5. We further agree with the district court that Converse's

interpretation of the phrase "without prejudice" is more reasonable than Starter's interpretation of that phrase, which would almost render the 1990 Agreement "illusory since Starter would be free to refile its application the very next day." *Id.* at *6.

Accordingly, the district court did not err in finding that the phrase "without prejudice" in the 1990 Agreement was ambiguous, being susceptible to both parties' interpretations. As a result, we find that the district court did not abuse its discretion in admitting extrinsic evidence of the intentions of the parties as to the meaning of this ambiguous contract phrase.

### 3. *Starter's Survey Evidence of "Actual Confusion"*

We turn next to Starter's claim that the district court abused its discretion by excluding a consumer survey prepared by Starter because this survey was the only evidence bearing on the issue of actual confusion which was offered at trial. Starter argues that the district court erred because the soundness of its survey method should go to the weight of this evidence, not its admissibility. We review the district court's evidentiary ruling for abuse of discretion, according "wide latitude" in excluding evidence that possesses an undue risk of prejudice or confusion of the issues, or is found to be marginally relevant to the issues in the case. *United States v. Blum*, 62 F.3d 63, 67 (2d Cir. 1995).

According to Starter, the survey was intended to simulate the experience of buying shoes at retail stores. Interviewers approached people in shopping malls to determine if they shared a profile with 70% of Starter's core customer-base (males age 12 to 35 planning to buy cross training shoes priced at $45 or more within the next six months). The respondents who fit the profile were asked to look briefly at a display of five different brands of athletic shoes, similar to store displays. The display included Converse shoes and prototypes bearing Starter marks as well as shoes made by other companies. After viewing the display briefly, a respondent was asked to look at two shoes,

one at a time, the way he might when trying to decide whether to buy them. The display was then covered with a cloth and an interviewer asked the respondent to indicate which shoe he preferred and to identify the names of the shoes.

In a pretrial Order, the district court granted Converse's motion to exclude Starter's survey and expert testimony thereon. The court reasoned (1) that the survey was not relevant because it did not test or demonstrate likelihood of consumer confusion, if any, and (2) that the slight probative value was outweighed by its prejudicial effect under Rule 403. At trial, the district court reaffirmed its exclusion, finding that the survey was little more than a memory test, testing the ability of the participants to remember the names of the shoes they had just been shown and gave no indication of whether there was a likelihood of confusion in the marketplace.

■ We hold that the district court did not abuse its discretion in finding that any probative value of the survey was outweighed by its potential to confuse the issues in the case. As long as expert survey evidence possesses sufficient "circumstantial guarantees of trustworthiness," a court may properly rely upon it to establish the likelihood or remoteness of confusion in a trademark dispute. See Fed.R.Evid. 807; *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1204–05 (E.D.N.Y.1983). The District Court correctly found however, "that a survey may be kept from the jury's attention entirely by the trial judge if it is irrelevant to the issues," citing *C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049 (5th Cir.1981). *See also* 4 McCarthy, § 32:170; and Fed.R.Evid. 402 ("Evidence which is not relevant is not admissible"). The Starter survey presents such a case.

Additionally, Starter has not yet brought shoes bearing its marks to market, making its survey, especially in the manner it was conducted, of little value in suggesting a lack of actual confusion of the consumer. Accordingly, we find that the district court did not abuse its discretion because it found the probative value of the survey so slight that it was easily outweighed, under a Rule 403 analysis, by the danger of confusion of the issues.

4. *Admission of Converse's Shoe Prototype*

■ Starter contends that the trial judge abused its discretion by admitting into evidence a shoe designed by Converse solely for this litigation in an attempt to establish the likelihood of confusion. Starter claims that the shoe bears none of the Starter Star Marks at issue. Therefore, the prototype shoe creates a danger of unfair prejudice to Starter that outweighs its probative value, thereby failing a Rule 403 balancing test. At trial, Converse argued that its version of a Starter shoe was relevant and admissible to show how Starter might infringe on its trademark. Because Starter had not actually marketed shoes yet, the district court admitted the prototype to "show the jury what a Starter shoe might look like, so long as the form of the exhibit finds support in evidence."

■ A party wishing to introduce an experiment for litigation must show "a substantial similarity" between the experiment and the actual conditions of the claim. *Jackson v. Fletcher,* 647 F.2d 1020, 1027 (10th Cir. 1981). The district court found that the testimony of Starter's footwear department manager that an oversized version of the S–and–Star mark might be chosen for enhanced visibility during sporting events showed that the prototype here was sufficiently similar in appearance to the proposed Starter shoe.

We hold that the district court did not abuse its discretion in admitting the shoe. First, the district court permitted Starter to offer its own prototype shoe. Second, from Starter's own introduction of shoe prototype evidence, Starter was free to argue (as it did) to the jury in closing that Converse's prototype was a gross exaggeration. Third, contrary to Starter's claims, a careful review of Converse's prototype reveals that the shoe does bear one of the Starter Star Marks in a rather enlarged size. Fourth, by bringing a declaratory judgment action before actually producing shoes bearing the disputed marks,

Starter opened itself up to prototype evidence from Converse.

## B. *Permanent Injunction*

■ Starter argues that the district court erred in awarding a permanent injunction in favor of Converse because the Declaratory Judgement Act, 28 U.S.C. § 2201–02 (the "Act"), does not authorize such relief under the circumstances of this case. In the alternative, Starter argues, as it did in its post-trial motions below, that even if the injunction was valid under the Act, the district court abused its discretion in granting an injunction which was impermissibly broad in light of the scope of the jury's verdict. We review a district court's entry of a permanent injunction in a trademark case for abuse of discretion, *see Nikon, Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993), and we review *de novo* questions of law concerning the district court's authority to grant the injunction, *see County of Seneca v. Cheney*, 12 F.3d 8, 11 (2d Cir.1993).

### 1. *The Grant of Injunctive Relief in a Declaratory*

*Judgment*

■ The district court *sua sponte* entered injunctive relief for Converse exercising "its discretion to issue an injunction in order to preserve the benefits obtained by the prevailing party in [a] declaratory judgement action." *Starter*, 1997 WL 391266, *8 (citing *Penthouse Int'l*, 792 F.2d at 950). Starter contends that the grant of an injunction *sua sponte* to a successful plaintiff without providing defendant with notice and a hearing is unprecedented and insupportable under the Declaratory Judgment Act. We disagree.

Section 2201 provides: "In a case or controversy within its jurisdiction . . . any Court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. . . ." 28 U.S.C. § 2201. The Act provides in § 2202: "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.

Generally, courts have invoked the Act to permit plaintiffs who have won a declaratory judgment from the court to enforce that judgment through injunction, damages and other relief. *See, e.g., Vermont Structural Slate Co. v. Tatko Bros. Slate Co.*, 253 F.2d 29, 29–30 (2d Cir.1958). Courts have also entered injunctions against unsuccessful plaintiffs because either the prevailing party requested such relief, which was granted after notice and hearing, *see, e.g., Petersime Incubator Co. v. Bundy Incubator Co.*, 135 F.2d 580, 584 (6th Cir.1943), or the defendant had initially sought injunctive relief in its counterclaims. *See, e.g., Penthouse Int'l Ltd. v. Barnes*, 792 F.2d 943, 950 (9th Cir.1986).

■ Affirmative defenses do not themselves support any affirmative relief, but rather they serve to defeat the plaintiff's claims. *See United States v. Timmons*, 672 F.2d 1373, 1379 (11th Cir.1982). Here, Converse waived its counterclaims before trial. Starter had not violated any law nor infringed Converse's trademark rights. Therefore, Starter argues that the district court abused its discretion by entering an injunction without a hearing on the "necessity, propriety and scope of the injunction." Converse counters that "it is not determinative that [it] asserted only affirmative defenses." On this issue, the district court held that "it elevates form over substance to suggest that [an injunction] could not be entered based on the jury's verdict . . ." and that refusing to enter an injunction against Starter "would be contrary to the dictates of common sense and judicial efficiency."[3]

---

**3.** Converse argues that Rule 8(c) allows the district court to deem a pleading "which a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense . . . if justice so requires." Fed.R.Civ.P. 8(c). Starter replies that Converse had not "mistakenly designated" its pleadings, requiring judicial intervention to serve the ends of justice. "The mistake that Converse made was to stipulate away the relevance of its affirmative defenses in order to obtain a litigation advantage" and waive its counterclaims altogether. We agree that Rule

The Act provides that "[a]ny such declaration shall have the force and effect of a final judgment or decree," 28 U.S.C. § 2201, and Fed.R.Civ.P. 54(c) provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Starter interprets Rule 54(c) to mean that relief may be granted where one of the parties to the litigation requests relief following trial "even if the party has not demanded such relief in the party's pleadings." Thus, under Starter's interpretation of Rule 54(c), the district court would neither be permitted to award injunctive relief *sua sponte* nor award injunctive relief to a party who abandoned such relief prior to trial. Accordingly, Starter argues that nothing in Rule 54(c) permits the district court to award injunctive relief after trial when Converse abandoned its request for relief before trial.

We find Starter's stilted interpretation of Rule 54(c) to be without merit. The plain language of Rule 54(c) does not limit the inherent powers of a district court to enter relief *sua sponte*. In addition, the district court certainly has discretion to grant relief to a party even where that party has earlier abandoned the same requested relief. Here, the district court did not believe that Rule 54(c) relief for Converse would involve inequitable maneuvering, but rather believed injunctive relief to be the most just resolution of the case. Therefore, we hold that the district court did not abuse its discretion by invoking its authority to grant a permanent injunction in favor of Converse *sua sponte* and despite Converse's earlier abandonment of such relief.

### 2. *Hearing on the Preliminary Injunction*

■ Starter contends that even if the Act authorizes the district court to grant injunctive relief *sua sponte*, the district court abused its discretion by failing to allow reasonable notice and a hearing concerning in-

junctive relief in violation of Starter's due process rights and the terms of Section 2202.

There is no basis to support Starter's contention that it was deprived of either notice or an opportunity to be heard. In several orders, the district court noticed Starter that it intended to enter injunctive relief in favor of Converse based on the jury verdict. Further, the district court instructed the parties to address the appropriate scope of these remedies in their post-trial briefs, which they did. Starter was most certainly heard on the issue. The notice given by the district court and the "paper" hearing held on the issue of injunctive relief gave Starter all the process it was due under the circumstances. *Accord Penthouse Int'l, Ltd. v. Barnes*, 792 F.2d 943, 950 (9th Cir.1986) (finding "[a]lthough the district court did not provide Penthouse with formal notice and hearing of a possible mandatory injunction, Penthouse was aware of the possibility and had an opportunity to be heard ...."). Therefore, the district court did not abuse its discretion by entering injunctive relief without a formal hearing in this case.

### 3. *The Scope of the Permanent Injunction*

■ Starter argues that even if the district court did not abuse its discretion in awarding the injunction to Converse, the scope of the injunction was overbroad and represented an independent abuse of discretion. A district court may abuse its discretion where a permanent injunction in a trademark case is too broad, *see, e.g., Nikon, Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993), i.e., not "narrowly tailored to fit specific legal violations" because the district court "should not impose unnecessary burdens on lawful activity." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir.1994). Further, in trademark infringement cases, "permanent injunctive relief will be granted only upon proof of the likelihood that purchasers of the product may be misled in the future...." *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir.1984).

8(c) is inappropriately invoked by Converse. Converse's answer in this case was the work-product of a savvy business entity with compe-

tent counsel who well understood the legal and technical differences between its defenses and counterclaims.

Here, the district court justified its injunction as an implementation of the jury's verdict. The jury determined that "Converse proved by a fair preponderance of the credible evidence that Starter's use of its S–and–Star trademark on athletic footwear would bring about a likelihood of consumer confusion as to source." The jury made the same finding on the use of Starter's Composite Mark. The district court injunction, however, prohibits Starter from "[u]sing Starter's S–and–Star and/or Composite Marks . . . either alone or in combination with any other words or designs, on footwear or in connection with the advertising, promotion, packaging, display, offer for sale or sale of footwear" and from filing trademark applications to use the same Marks "either alone or in combination with any other words or designs, as a trademark for footwear."

Starter argues that the injunction exceeds the scope of the jury's findings which were limited to the use of the Starter Star marks alone on athletic footwear. Starter contends that the injunction would prevent Starter from marketing its trademark in combination with other designs and on non-athletic footwear as it had done previously on such products as its Rugged Terrain shoe.

We find that the district court abused its discretion by enjoining the use of the Starter Star Marks on all footwear when "in combination with any other words or designs." First, the jury's findings went only to the use of the Starter Star marks when used alone; the jury reached no conclusion as to the use of the marks in combination with other designs. Yet the language of the injunction, proposed by Converse and ordered by the district court, is broad enough to bar the continued use of Starter Star marks when used in combination with other designs on such products as the Rugged Terrain shoe. This result is clearly wrong since Converse's witnesses testified that Starter's use of its Mark on the Rugged Terrain shoe was not at issue in this litigation and its attorneys so agreed. We have vacated injunctions in other trademark cases that have gone beyond the scope of the issues tried in the case. *See Waldman Publ'g,* 43 F.3d at 785.

Moreover, Converse's counsel conceded during the conference on the jury instructions that the Rugged Terrain boot was not directed at a marketplace in which Converse has a stake. There may be little likelihood of confusion where two entities use the same trademark in different though related markets. *See, e.g., The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, (2d Cir.1996) (finding no market overlap where a sporting goods store and a restaurant oriented to sports enthusiasts used the term "The Sports Authority"). Therefore, the district court should not have entered an injunction that would encompass the Rugged Terrain Shoe because Converse virtually conceded that there would be no "likelihood that purchasers of the product may be misled in the future." *Burndy Corp.,* 748 F.2d at 772.

The language of the injunction is also too broad because on its face it would include any and all footwear. The jury's verdict however, specified "athletic footwear." As reflected by the discussion of the jury instructions between the parties, "athletic footwear" appears to have a specialized meaning in the sports apparel industry which would seem to exclude a hiking boot like the Rugged Terrain shoe. Accordingly, the injunction should have modified its reference to "footwear" with the adjective "athletic."

Because the injunction exceeds the jury's findings of infringement upon Converse's rights, it is overly broad and, in that respect, represents an abuse of the discretion of the district court. Therefore, we remand to the district court so that it may craft an order of injunctive relief more narrowly tailored to the scope of the jury verdict in this case.

## III. CONCLUSION

The judgment of the district court is AFFIRMED in part and REVERSED in part, the permanent injunction VACATED and REMANDED for issuance consistent with this order.